**PUBLISHED**

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

NATIONAL LABOR RELATIONS BOARD,
                              *Petitioner,*

v.

MEDIA GENERAL OPERATIONS,
INCORPORATED, d/b/a Richmond
Times-Dispatch,

                              *Respondent.*

No. 03-1469

MEDIA GENERAL OPERATIONS,
INCORPORATED, d/b/a Richmond
Times-Dispatch,

                              *Petitioner,*

v.

NATIONAL LABOR RELATIONS BOARD,
                              *Respondent.*

No. 03-1566

On Application for Enforcement and Cross-petition
for Review of an Order
of the National Labor Relations Board.
(5-CA-29619)

Argued: December 3, 2003

Decided: March 4, 2004

Before WIDENER and KING, Circuit Judges,
and Richard D. BENNETT, District Judge of the
United States District Court for the District of Maryland,
sitting by designation.

Application for enforcement granted and cross-petition for review denied by published opinion. Judge King wrote the opinion, in which Judge Widener and Judge Bennett joined.

---

**COUNSEL**

**ARGUED:** Louis Michael Zinser, THE ZINSER LAW FIRM, P.C., Nashville, Tennessee, for Media General. James Matthew Oleske, Jr., NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Board. **ON BRIEF:** Glenn E. Plosa, THE ZINSER LAW FIRM, P.C., Nashville, Tennessee, for Media General. Arthur F. Rosenfeld, General Counsel, John E. Higgins, Jr., Deputy General Counsel, John H. Ferguson, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, Fred L. Cornnell, Supervisory Attorney, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Board.

---

**OPINION**

KING, Circuit Judge:

   The National Labor Relations Board has applied to this Court for enforcement of its March 28, 2003, Decision and Order issued against Media General Operations, Incorporated, d/b/a *Richmond Times-Dispatch*. *Media General*, 338 N.L.R.B. 126 (2003) (the "Order"). By its Order, the Board found that Media General had violated sections 8(a)(1) and 8(a)(5) of the National Labor Relations Act (the "Act"), and it ordered Media General to bargain with the International Association of Machinists and Aerospace Workers, AFL-CIO (the "International" or "IAM") as the exclusive bargaining representative of certain Media General employees. *Id.* Media General has cross-petitioned for our review of the Order. As explained below, we grant the Board's application for enforcement and we deny Media General's cross-petition for review.

## I.

## A.

Media General is a Virginia newspaper publisher that operates a production facility in Mechanicsville, Virginia. On August 11, 2000, the International filed a petition with the Board seeking to represent a group of the Mechanicsville production facility's maintenance and facilities employees. On August 25, 2000, Media General and the International entered into a "Stipulated Election Agreement," which identified the employees to be included in the bargaining unit and provided that a secret-ballot election would be held on September 22, 2000, to determine whether those employees would be represented by the International.[1]

On September 13, 2000, the International conducted a voluntary meeting for the employees in the proposed bargaining unit. At the meeting, an International representative circulated a petition that reflected a signing employee's intention to "vote yes" for representation by the International in the upcoming election (the "Vote Yes Petition"). The Vote Yes Petition provided, in relevant part:

### WE ARE VOTING YES!

We, the undersigned employees of TIMES DISPATCH located in, [sic] Richmond, Virginia hereby authorize the International Association of Machinists and Aerospace Workers (IAM) to represent us in collective bargaining with our employer.

We have made a commitment and promise to ourselves, each other, and to the IAM to vote YES! WE *WILL NOT* fall for the company's scare tactics!

---

[1]Pursuant to the Stipulated Election Agreement, the bargaining unit consisted of all of Media General's full-time and regular part-time maintenance machinists, HVAC technicians, electro-mechanical technicians, electronic technicians, maintenance utility workers, maintenance mechanics, electrical technicians, and facilities systems technicians, who worked in the Mechanicsville production facility.

Furthermore, we AUTHORIZE the IAM to use this petition THROUGH ANY METHOD to urge our co-workers to vote YES.

WE WILL NOT CHANGE OUR MINDS!

WE WILL STAND BY OUR WORD!

WE WILL VOTE YES!

During this meeting, and at a later meeting, the International solicited signatures on the Vote Yes Petition. According to two employees in attendance, one of the International's representatives stated that he wanted everyone to sign the Vote Yes Petition, and he commented, "[t]his is where you separate the men from the boys."

Several employees who attended the meetings discussed the Vote Yes Petition with Media General officials, and one of them informed Media General that the Vote Yes Petition would be made public. In response, Media General, two days before the election, circulated a Memorandum to the employees in the proposed bargaining unit, advising them of their unconditional right to "vote no" on union representation and of their right to choose not to attend the International's meetings (the "Company Memorandum"). The Company Memorandum, from Director of Operations William R. Barker ("Director Barker"), characterized the Vote Yes Petition as a "straw vote" and stated, in relevant part:

> Let me make a few things clear. That straw vote means nothing. It cannot be used in any way at the election on Friday. Regardless of whatever you may have written down at the "straw vote," on Friday you still get to vote your free choice in the NRLB-conducted secret ballot election. You have the absolute right to Vote NO on Friday regardless of whatever you did in the "straw vote."

> I was also told by some of you that the union has a meeting scheduled tonight. Whether or not you attend that meeting is your free choice. I wanted to make clear to you that you

have no obligation to attend that meeting in order to try to correct or change your vote in last week's "straw vote." You may decide to freely skip tonight's union meeting and to go to the polls on Friday, September 22 and VOTE NO in the NLRB-conducted secret ballot election.

On September 21, 2000, the day before the election, employees in the proposed bargaining unit distributed copies of the Vote Yes Petition throughout the Mechanicsville workplace. It contained twenty employee names, most of which were printed on lines in the left-hand column of the Vote Yes Petition, with corresponding signatures on lines in a separate column to the right of the printed names. One employee, Richard Tingler, had printed his name in the left-hand column of the Vote Yes Petition, but he had failed to sign his name in the right-hand column. Instead, the signature of William D. Slayton, another employee, was on the line in the right-hand column next to Tingler's printed name. Slayton's name was also printed, and signed for a second time, two lines below Tingler's printed name.

On September 22, 2000, the Board conducted the scheduled secret-ballot election. Sixteen employees in the proposed bargaining unit cast ballots in favor of collective-bargaining representation by the International, while fifteen employees voted against such representation.

B.

On September 29, 2000, Media General filed objections to conduct affecting the results of the election with the Board's Regional Director.[2]

[2]The applicable regulations provide that "if objections to the conduct of an election are filed within 7 days after the tally of ballots has been prepared, the Regional Director . . . conducts an investigation and rules on the objections." 29 C.F.R. § 101.19(a)(4). The Board's Region 5, which includes the Old Dominion, had an Acting Regional Director in place when Media General filed its objections to the election. By November 28, 2000, when Media General sought reconsideration by Region 5, a Regional Director had been appointed. For our purposes, we refer to the Acting Regional Director and Regional Director as the "Regional Director."

Among its objections, Media General asserted that the International had violated "established law" by circulating copies of the Vote Yes Petition on the eve of the election, and it requested that the election be set aside. Media General also claimed that the Vote Yes Petition contained a forgery because "the hand that started printing 'Richard G. Tingler' was not the same hand that concluded printing 'Richard G. Tingler.'"[3] On November 16, 2000, the Regional Director issued a report recommending that Media General's objections be overruled and that a Certification of Representation be issued. *Media General*, Case 5-RC-15077, at 9 (Nov. 16, 2000) (the "Report on Objections"). Before the Board acted, Media General filed a motion for reconsideration of its objections, which was denied by the Regional Director on December 27, 2000. *Media General*, Case 5-RC-15077 (Dec. 27, 2000) (the "Order Denying Reconsideration").

On January 24, 2001, the Board adopted the findings made by the Regional Director in his report of November 16, 2000. Accordingly, the Board certified the International as the exclusive collective-bargaining representative of the employees in the proposed bargaining unit. *Media General*, Case 5-RC-15077 (Jan. 24, 2001) (the "Certification Decision").

On February 15, 2001, the International's local affiliate, Richmond Lodge No. 10, International Association of Machinists and Aerospace Workers ("Lodge 10"), directed a letter to Media General requesting bargaining unit information that Lodge 10 considered "essential to bargain intelligently on the issues of wages and working conditions in the forthcoming negotiations" (the "February Letter"). Media General responded to the February Letter on March 13, 2001, stating, "[t]his letter is in response to your letter dated February 15, 2001. Please be advised, with all due respect, that the *Richmond Times-Dispatch* declines to recognize or bargain with your union."

On April 2, 2001, the International filed with the Regional Director

---

[3]The theory that Richard Tingler's printed name was written by two persons initially came from an affidavit executed by Director Barker, who asserted that his "visual inspection of the document quickly confirms this."

an unfair labor practice charge against Media General.[4] The charge asserted that Media General had interfered with, restrained, and coerced employees in the exercise of their rights under section 8(a)(1) of the Act, and that it had refused to bargain in good faith with the International, in violation of section 8(a)(5) of the Act.[5] In support of its contention that Media General had refused to bargain, the International stated that it had "requested negotiations" on February 15, 2001, and that Media General had "declined our request on March 13, 2001."

Acting on the International's allegations, the Regional Director, on April 16, 2001, issued a Complaint and Notice of Hearing against Media General, asserting violations of sections 8(a)(1) and 8(a)(5) of the Act.[6] In its Answer, filed on April 26, 2001, Media General denied that it had refused to bargain with the International and claimed that it was "under no duty to bargain with IAM as the certification election was tainted by IAM's objectionable conduct. IAM's objectionable conduct prevented voters from freely and fairly selecting whether or not to be represented."

---

[4]An investigation of an alleged unfair labor practice is initiated by filing a charge with the Regional Director for the Board Region in which the alleged violation occurred. 29 C.F.R. § 101.2.

[5]Pursuant to section 8(a)(1) of the Act "[i]t shall be an unfair labor practice for an employer M to interfere with, restrain, or coerce employees in the exercise of their rights guaranteed in section 157 of this title . . . ." 29 U.S.C. § 158(a)(1). Under § 157 of Title 29:

> Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection . . . .

*Id.* § 157.

Section 8(a)(5) of the Act provides that "[i]t shall be an unfair labor practice for an employer — to refuse to bargain collectively with the representatives of his employees . . . ." *Id.* § 158(a)(5).

[6]The regulations provide that "[i]f the charge appears to have merit and efforts to dispose of it by informal adjustment are unsuccessful, the Regional Director institutes formal action by issuance of a complaint and notice of hearing." 29 C.F.R. § 101.8.

On May 11, 2001, the Board's General Counsel moved for summary judgment on the Complaint, and on May 16, 2001, the Board issued a notice to show cause why summary judgment should not be awarded.[7] In response to the show cause notice, Media General reiterated its objection to the Board's certification of the International, and it further maintained that "[n]o one on behalf of the IAM has ever made a demand to bargain." Although Media General admitted that Lodge 10 had submitted a valid bargaining demand in the February Letter, it contended that the February Letter was not attributable to the International.

On March 28, 2003, the Board issued the Order underlying this dispute, granting the General Counsel's motion for summary judgment. In so ruling, the Board determined that Media General had presented no newly discovered evidence on the validity of the election results, and it declined to reexamine its Certification Decision. Order at 1. The Board then addressed Media General's contention that only Lodge 10 had demanded bargaining rights, and that the International had never made a bargaining demand. On this point, the Board found that "even if the February 15, 2001 letter was not, in itself, a sufficient demand by the International, the refusal-to-bargain charge filed by the International on April 2, 2001, which referred to that letter, clarified any ambiguity as to which entity was requesting bargaining." *Id.* at 2. Accordingly, the Board concluded that Media General's refusal to bargain with the International violated sections 8(a)(1) and 8(a)(5) of the Act, and it ordered Media General to bargain with the International. *Id.* at 3. On April 23, 2003, Media General filed a motion for a stay of the Order, along with a motion for reconsideration. On May 8, 2003, both motions were denied.

The Board thereafter applied to this Court for enforcement of the Order, and Media General has cross-petitioned for our review thereof. We possess jurisdiction pursuant to sections 10(e) and (f) of the Act. *See* 29 U.S.C. § 160(e), (f).

---

[7]The General Counsel of the Board is responsible for prosecuting complaints before the Board. 29 U.S.C. § 153(d).

## II.

The Board's conclusion that an election resulted in a fair vote for union representation is a discretionary matter, and we are obliged to accord it great deference. *NLRB v. Columbia Cable TV Co., Inc.*, 856 F.2d 636, 638 (4th Cir. 1988). We presume a Board-supervised election to be valid, and we may overturn such an election only if the Board has clearly abused its discretion. *NLRB v. Maryland Ambulance Servs. Inc.*, 192 F.3d 430, 433 (4th Cir. 1999); *Case Farms of North Carolina, Inc. v. NLRB*, 128 F.3d 841, 844 (4th Cir. 1997). A party seeking to overturn an election "bears a heavy burden" and "must prove by specific evidence not only that campaign improprieties occurred, but also that they prevented a fair election." *Elizabethtown Gas Co. v. NLRB*, 212 F.3d 257, 262 (4th Cir. 2000). The Act requires that we treat as conclusive any Board findings that are "supported by substantial evidence on the record considered as a whole . . . ." 29 U.S.C. § 160(e).

## III.

In its opposition to the Board's application for enforcement and in its cross-petition for review, Media General maintains that the Board erred in ordering it to bargain with the International. In support of this contention, Media General asserts: (1) that circulation of the Vote Yes Petition "intimidated, threatened, and coerced employees" into voting "yes" for representation by the International; (2) that the Vote Yes Petition contained a forgery; (3) that the Board should have accorded Media General an evidentiary hearing before making its Certification Decision; and (4) that, if certification was proper, the International failed to make a proper bargaining demand. We address these contentions in turn.

## A.

Media General first asserts that the Certification Decision constituted an abuse of discretion because the International had "intimidated, threatened, and coerced" employees into signing the Vote Yes Petition and into ultimately voting for representation by the International. Accordingly, Media General contends that it is under no duty to recognize the International as the exclusive collective-bargaining

representative of the employees in the bargaining unit. We are obliged to reject this contention.

1.

As an initial matter, we reject Media General's suggestion that vote yes petitions are *per se* coercive. As the Sixth Circuit has explained, "although pre-election polling by an employer is *per se* objectionable, a union seeking to represent employees has a different relationship to them that makes pre-election polling less coercive." *Maremont Corp. v. NLRB*, 177 F.3d 573, 578 (6th Cir. 1999) (citing *Kusan Mfg. Co. v. NLRB*, 749 F.2d 362, 364 (6th Cir. 1984)). The proper inquiry is whether circulation of the Vote Yes Petition, under the circumstances leading to this election, interfered with the free and fair choice of the employees. *See id.*; *Van Leer Containers, Inc. v. NLRB*, 841 F.2d 779, 785 (7th Cir. 1988); *Nu Skin Int'l*, 307 N.L.R.B. 223, 223 (1992).

Contrary to Media General's contention, the Supreme Court's decision in *NLRB v. Savair Manufacturing Co.*, 414 U.S. 270 (1973), does not mandate a finding that vote yes petitions are inherently coercive. In *Savair*, the union had circulated recognition slips reflecting the names of the employees who had agreed to support it. *Id.* at 272. As incentive for signing these slips prior to the election, the union had offered to waive the employees' union initiation fees. *Id.* at 273. In finding this practice objectionable, the Court recognized that an employee's "outward manifestation of support must often serve as a useful campaign tool in the union's hands to convince other employees to vote for the union . . . ." *Id.* at 277. As we have explained, however, "the linchpin of *Savair* is the linkage between the offer to waive the initiation fee and a pre-election commitment to support the union. It is this linkage that constitutes the union's impermissible interference in the election." *NLRB v. VSA, Inc.*, 24 F.3d 588, 593 (4th Cir. 1994) (citing *Savair*, 414 U.S. at 275-78). Here, the International made no offer to waive the union fees or dues of signing employees, and the *Savair* decision is easily distinguishable.

2.

Turning to the facts relating to this election, Media General contends that two remarks made by an International representative at a

meeting with the employees in the proposed bargaining unit — "I want everyone to sign this" and "[t]his is where you separate the men from the boys" — rendered a fair election impossible. In support of this contention, Media General relies on the subjective reactions of two of those employees, who stated that they "felt pressure to sign the petition." The Board found, however, that these employee statements failed to establish that the free choice of a reasonable employee would have been hindered, and we are unable to disagree with that finding.

First of all, the "[s]ubjective reactions of employees are irrelevant to the question of whether there was, in fact, objectionable conduct." *Kmart Corp.*, 322 N.L.R.B. 1014, 1015 (1997). As one of our sister circuits has explained, the test for coercion is an objective one, and the relevant question is "whether the alleged misconduct is of a type that would cause interference with the free choice of a reasonable employee." *AOTOP, LLC v. NLRB*, 331 F.3d 100, 104 (D.C. Cir. 2003) (affirming Board's finding that union agent did not engage in objectionable conduct when she advised employees that they "had to" vote for union). Furthermore, the responsibility for assessing the relevant facts and deciding whether the union's conduct interfered with a reasonable employee's free and fair choice in a representation election lies with the Board. *Id.*

Secondly, we have recognized that election campaigns, by their nature, are rough and tumble affairs, and they typically involve elements of pressure or inducement. *See, e.g.*, *VSA*, 24 F.3d at 595 (upholding union's offer to waive union initiation fees if union won election as permissible campaign tactic, where offer applied equally to all employees). And, "while '[c]oercive conduct is never condoned during the election process . . . the Board will not set aside an election unless an atmosphere of fear and coercion rendered free choice impossible.'" *Id.* (quoting *NLRB v. Herbert Halperin Distrib. Corp.*, 826 F.2d 287, 290 (4th Cir. 1987)); *see also NLRB v. Coca-Cola Bottling Co.*, 132 F.3d 1001, 1003 (4th Cir. 1997) ("An election is by its nature a rough and tumble affair, and a certain amount of 'exaggerations, hyperbole, and appeals to emotions are to be expected.'") (citations omitted)).

In the circumstances of this dispute, the Regional Director found that a reasonable employee would not have felt coerced into voting

for the International.[8] His finding on this point is amply supported for at least two reasons: (1) Media General officials spoke to those employees who had expressed concern about signing the Vote Yes Petition, and those officials explained that the "petition meant nothing" and that the employees could still vote "NO" in the election; and (2) after learning about the Vote Yes Petition, Media General circulated the Company Memorandum to all employees in the proposed bargaining unit, explaining that they had the right to vote against representation in the election.[9] Accordingly, the Board's determination that the employees in the proposed bargaining unit were not coerced into supporting the International was supported by substantial evidence.

## B.

Media General next contends that the Vote Yes Petition contained

---

[8]In his Order Denying Reconsideration, the Regional Director stated as follows:

> [The] actions of the [International] did not involve inducements or coercion. . . . Although some employees may have been influenced to sign the petition by the group dynamic or even a feeling of peer pressure, and then have had second thoughts about having done so, there is no requirement that such employee petitions be signed in solitary sanctity such as accompanies the marking of ballots in a Board-conducted election. As the Employer correctly explained to employees in its September 20 memorandum, the petition, "means nothing"; voters have the "absolute right" to vote "yes" or "no" in the Board-conducted secret ballot election regardless of whether they signed the petition.

*Media General*, Case 5-RC-15077 (Dec. 27, 2000).

[9]We also find meritless Media General's convoluted contention that the Vote Yes Petition "was circulated to ensure that management saw it," as part of the International's "calculated strategy of coercion" and as a "first step" toward causing Media General to discriminate against International supporters. Nothing in the record suggests that the International circulated the Vote Yes Petition to ensure that Media General would discriminate against International supporters. And in signing the Vote Yes Petition, the employees authorized the International to "use the petition THROUGH ANY METHOD to urge [their] co-workers to vote YES."

a forgery that requires the representation election at Mechanicsville to be set aside. As the Board found, however, this contention must also be rejected.

In support of its initial objections to the election result, Media General submitted the affidavit of Director Barker, who had performed "a visual inspection" of the Vote Yes Petition, stating his view that the *printed* name, "Richard G. Tingler," appeared to have been written by two different persons — the "Richard G. T" portion being written by one person, and the last six printed letters, the "ingler" portion thereof, being written by another person. The Regional Director rejected this claim in his Report on Objections, observing that (1) Director Barker was not a handwriting expert; (2) Media General had failed to produce any samples of Richard Tingler's handwriting; and (3) review of other available materials indicated that Tingler's name was printed by him. *Media General*, Case 5-RC-15077, at 9 (Nov. 16, 2000).

In its motion for reconsideration, Media General abandoned its initial claim that Tingler's *printed* name was a forgery. It then acknowledged that "Mr. Tingler's hand-printed name on the petition is identical to the examples of Mr. Tingler's hand-printed name supplied" with the reconsideration request. Media General's second forgery theory on Tingler, as presented in its motion for reconsideration, was that William Slayton's signature, in the right-hand column next to Tingler's printed name, was a forgery of Tingler's signature. Rejecting this contention, the Regional Director, in his Order Denying Reconsideration, observed that it was "obvious" from the face of the Vote Yes Petition that "William B. Slayton signed his name in cursive in the space next to where Richard Tingler signed his name in printed form." *Media General*, Case 5-RC-15077 (Dec. 27, 2000). That is, Slayton did not forge Tingler's signature; he signed his own name in the right-hand column of the Vote Yes Petition, immediately to the right of Tingler's printed name.

Seeking to utilize these findings of the Regional Director in support of its contention on Tingler and the forgery claim, Media General now asserts that the Region's handling of its two forgery theories has been inconsistent. More specifically, it now asserts:

Region 5 conducted a six (6)-week investigation to declare, initially, that the signature on the right column that corresponded to Tingler's printed name was unquestionably Tingler's signature. On reconsideration, after receiving copies of Tingler's signature, Region 5 declared that the signature was unquestionably *not* Tingler's signature. This explicit inconsistency alone entitled *Richmond Times-Dispatch* to a re-running of the election.

Contrary to Media General's assertions, the Regional Director, in his Report on Objections, did not conclude that the signature next to Tingler's printed name was that of Richard Tingler. Although he referred to a "signature," the Regional Director was addressing Media General's initial theory about Tingler's *printed* name being forged. By contrast, the Regional Director, in his Order Denying Reconsideration, was responding to Media General's second forgery theory, concerning whether Slayton's *signed* name was a forgery of Tingler's *signed* name. These separate findings, responding to the alternative theories presented by Media General, are not inconsistent with one another, and we agree with the Board that there was no forgery apparent on the face of the Vote Yes Petition.[10]

---

[10]Equally unavailing is the suggestion that employees in the proposed bargaining unit were misled by Richard Tingler's printed name on the Vote Yes Petition — believing that he had signed it, when in fact he had not. This contention, similar to the contention that the appearance of twenty names on the face of the Vote Yes Petition constituted a misrepresentation because only sixteen employees actually voted for representation, is untenable. As we have explained, the Board considers employees to be "'mature individuals who are capable of recognizing campaign propaganda for what it is and discounting it.'" *Case Farms of North Carolina, Inc. v. NLRB*, 128 F.3d 841, 844 (4th Cir. 1997) (quoting *Midland Nat'l Life Ins. Co.*, 263 N.L.R.B. 127, 132 (1982) (quoting *Shopping Kart Food Mkt., Inc.*, 228 N.L.R.B. 1311, 1313 (1977))).

The Regional Director concluded that the employees in the proposed bargaining unit could recognize the obvious: that William Slayton signed his name in the column next to Richard Tingler's name. Furthermore, the employees were informed by the Company Memorandum that signing the Vote Yes Petition did not require an employee to vote in favor of representation. Accordingly, the appearance on the Vote Yes Petition of names of employees who may not have voted for representation is not misleading. If anything, it demonstrates that employees felt free to vote "no" in the election even though they had subscribed to the Vote Yes Petition.

## C.

Media General next contends that the Board erred in failing to conduct a hearing on Media General's objections to the International's pre-election conduct. On this point, we have explained that "[p]re-certification evidentiary hearings are necessary only if there are substantial and material issues of fact relating to the validity of the election." *VSA*, 24 F.3d at 596 (citing *Columbia Cable*, 856 F.2d at 639; *NLRB v. Hydrotherm*, 824 F.2d 332, 335 (4th Cir. 1987); *NLRB v. Bata Shoe Co.*, 377 F.2d 821, 825 (4th Cir. 1967))). In deciding whether "substantial and material issues" exist, the allegations of the objecting party are to be accepted as true; however, an objecting party's disagreement with the inferences or interpretations placed on the findings of the Board does not mean that a pre-certification evidentiary hearing should have been conducted. *Id.* at 597-98 (citations omitted).

In support of this contention, Media General submitted, and the Regional Director accepted as true, the affidavits of certain employees in the proposed bargaining unit. Those affidavits reflected statements made by an International agent and set forth the affiants' subjective feelings of pressure to vote for representation. Accepting those affidavits as true, the Regional Director nevertheless found no coercion or interference with the employees' free choice. Additionally, he found no validity in Media General's contention that Richard Tingler's printed name was written by two different individuals. In denying Media General's motion for reconsideration, the Regional Director reviewed these assertions a second time. He then reaffirmed his finding of no coercion and rejected Media General's second forgery theory. Finally, the Board, by its Certification Decision, adopted the Regional Director's findings and recommendations and certified the election.

In sum, Media General now contends that the Board *should have* ruled in its favor, and that it abused its discretion in not granting a pre-certification evidentiary hearing.[11] This contention simply consti-

---

[11]Media General suggests that, because the election was decided by a close vote, it was necessarily entitled to a pre-certification evidentiary

tutes a disagreement with the Board's factual findings, and it does not warrant a pre-certification evidentiary hearing. *See VSA*, 24 F.3d at 598.

The Sixth Circuit's decision in *NLRB v. Gormac Custom Manufacturing Co.*, 190 F.3d 742, 749 (6th Cir. 1999), relied on by Media General, is readily distinguishable. In *Gormac*, the union had circulated a vote yes petition in the employer's offices three hours before the election, and the court ruled that the Board had abused its discretion in denying a pre-certification hearing. *Id.* at 751. In *Gormac*, there was a disputed issue of material fact on whether union officials had promised employees that their signing of the Vote Yes Petition would be confidential. *Id.* There is no such disputed issue here. The employees in the proposed bargaining unit were not promised confidentiality; in fact, the Vote Yes Petition stated on its face that "we AUTHORIZE the IAM to use this petition THROUGH ANY METHOD to urge our co-workers to vote YES."

In these circumstances, the Board did not abuse its discretion in failing to conduct a pre-certification evidentiary hearing.

D.

Finally, Media General contends that, even if the Certification Decision was appropriate, the International failed to validly request bargaining with Media General. It premises this contention on the fact that the February Letter was sent to Media General by Local 10 rather than by the International.

---

hearing. We agree that closer scrutiny is warranted when an election is decided by a close vote. *See Savair*, 414 U.S. at 278 (applying stricter scrutiny when one vote would have altered election's outcome). We have examined each of Media General's contentions carefully and with strict scrutiny, however, and as we observed in *VSA*, "even close scrutiny here discloses no abuse of discretion by the Board in . . . not granting [the employer] an evidentiary hearing." *VSA*, 24 F.3d at 598 n.22.

As we have acknowledged, a local union affiliate, for purposes of the exclusivity of bargaining requirement, is an entity separate and distinct from its international parent. *United Elec., Radio & Mach. Workers (UE) v. NLRB*, 986 F.2d 70, 75 (4th Cir. 1993). Accordingly, in *UE*, we upheld the Board's decision that an employer was not required to bargain with either the international or its local affiliate when the employer was confused about whether the demand came from the union's local affiliate, which was certified, or from the parent international union, which was not certified. *Id.* at 76. As Judge Wilkinson explained, an employer has "a negative duty to bargain with no other entity than the certified bargaining representative. . . . The Company thus risked committing an unfair labor practice if it negotiated with a labor organization other than the properly affiliated [certified union]." *Id.* at 75.

Media General contends that, because it was required to bargain only with the certified International, and the February Letter came from Local 10, legitimate confusion arose as to which entity had demanded bargaining. In *NLRB v. Williams Enterprises, Inc.*, 50 F.3d 1280, 1287 (4th Cir. 1995), we held that an inadequate request to bargain (a telephone call by a union agent), plus the filing of an unfair labor practice charge, constituted a valid bargaining demand. As we explained, "'[a] valid request to bargain need not be made in any particular form, or *in haec verba*, so long as the request clearly indicates a desire to negotiate and bargain on behalf of the employees.'" *Id.* at 1286 (quoting *Stanford Realty Assocs. v. NLRB*, 306 N.L.R.B. 1061, 1066 (1992)). In this instance, the February Letter, standing alone, may have constituted an inadequate bargaining request, but it did not stand alone. The Board found that any ambiguity as to which entity was requesting to bargain for the employees at Mechanicsville was clarified when the International filed its unfair labor practice charge against Media General on April 2, 2001, adopting the February Letter. The International there stated that it had "requested negotiations" on February 15, 2001, and that Media General had "declined *our request* on March 13, 2001" (emphasis added). The Board's finding on this point is supported by substantial evidence, and it is therefore conclusive. Pursuant thereto, this contention must also be rejected.

## IV.

Pursuant to the foregoing, we grant the Board's application for enforcement and deny Media General's cross-petition for review.

*APPLICATION FOR ENFORCEMENT GRANTED AND*
*CROSS-PETITION FOR REVIEW DENIED*